Joseph H. Harrington
Acting United States Attorney
Eastern District of Washington
David M. Herzog
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SETH RANDLES,<br><br>Defendant. | Case No. 2:17-CR-00222-SAB-1<br><br>UNITED STATES' SENTENCING POSITION AND RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSIR<br><br>Sentencing Hearing:<br>October 8, 2021, at 1:30 p.m.<br>Spokane, Washington |

Plaintiff United States of America, by and through Joseph H. Harrington, Acting United States Attorney for the Eastern District of Washington, and David M. Herzog, Assistant United States Attorney for the Eastern District of Washington, hereby submits the following Sentencing Memorandum with regard to Defendant Seth Randles ("Defendant").

The United States recommends a sentence of 240 months (20 years) in custody, 15 years of supervised release, no fine, restitution as requested by Defendant's victims, a mandatory special assessment of $100, and a $5,000 special assessment absent a finding of indigence by the Court.

1        The United States' sentencing position is based on the attached memorandum of

2    points and authorities, the files and records in this case, and such further evidence and

3    argument as the Court may permit.

4    Dated: September 16, 2021             Joseph H. Harrington
                                      Acting United States Attorney

5

6                                          *s/ David M. Herzog*

7                                          David M. Herzog
                                      Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.    Introduction**

Seth Randles ("Defendant") is a violent, manipulative human trafficker and pimp, and he should be sentenced accordingly. For years, he forced women to engage in sex with men of his choosing, for his own financial gain, and he repeatedly and continuously beat his victims into compliance. He even caused at least one of them to get a tattoo of his street name "Silky" on her leg – just to make it absolutely clear that she was his property. Defendant's conduct was reprehensible, and there is no amount of after-the-fact explanation that justifies or mitigates it. Defendant has richly earned every single day of a 20-year custodial sentence and 15 years of Supervised Release, the highest sentence available under the Rule 11(c)(1)(C) Plea Agreement in this case.

**II.    Facts**

The facts are set forth in the *Offense Conduct* section of the Presentence Report ("PSIR"), ECF No. 102, ¶¶ 11-65, and the *Factual Basis* section of Defendant's Plea Agreement, ECF No. 84, ¶ 5. It is difficult to imagine conduct more deserving of a 20-year sentence.

    **A.    Victim M**

Beginning as early as 2015, Defendant began sex trafficking Victim M against her will. When she refused to do as he wanted, he dragged her out of the shower by her hair, pushed and kicked her, stomped on her body, and punched her in the mouth. ECF No. 102, ¶ 12. Her mother was so terrified of Defendant that she repeatedly told law enforcement officers that she feared Defendant would kill Victim M or retaliate against her family if he found out they had contacted law enforcement. *Id.* at ¶ 13.

For approximately two years, Defendant trafficked Victim M. But the word "trafficking" is a euphemism. Defendant forced Victim M to engage in non-consensual sexual acts with strangers he chose for her, so he could make money off of her body, while using gruesome physical violence and the threat of force to ensure her compliance. It was exactly as ugly as it sounds.

1    In 2017, Victim M was ready to go to the police herself – not because of the
2   violence and rapes that Defendant subjected her to from 2013-2016, but because of her
3   concerns about what he was then doing to his newest victim.  *Id.* at ¶ 18.

4    Defendant led Victim M to believe that she was in a "normal" romantic
5   relationship with him before trafficking her, which is standard practice for so-called
6   "Romeo pimping" (as set forth below in the United States' response to Defendant's
7   objections to the PSIR).  *Id.* at ¶ 21-23.  Defendant forced Victim M to engage in both
8   oral sex and intercourse with "clients" of his choosing, generally at his residence in
9   Spokane.  *Id.*  She had to perform these sexual acts on the main floor while Defendant
10  hid on the second floor.  *Id.*  Defendant also used that residence to stage photos of
11  women that he could post on Backpage.com to advertise for additional sex trafficking.
12  *Id.*

13   Victim M was clear and detailed about Defendant's sex trafficking operation.
14  Defendant gave Victim M explicit instructions on how to perform sexual acts and
15  provided her with scripted lines she was required to memorize and use when
16  communicating telephonically with "clients."  *Id.*  She was prohibited from writing
17  down the scripts, because Defendant correctly feared that if law enforcement found
18  them, they would become evidence.  *Id.*  Instead, Defendant taught Victim M how to
19  "screen" prospective "clients" to ensure they were not law enforcement and told her not
20  to incriminate herself by discussing sex acts or pricing for sex acts over the telephone.
21  *Id.*  Defendant also made "clients" go to a nearby church, rather than directly to his
22  residence, so he could visually confirm that they were not law enforcement.  *Id.* at ¶ 17.
23  If Victim M deviated from the script or did not comply with Defendant's orders, he
24  violently assaulted her: he would kick, drag or punch her until she was unable to perform
25  sexual acts due to the severity of the bruises all over her body.  *Id.* at ¶ 23.  Victim M
26  also reported that Defendant would drag her by her hair, stomp on her body, put her in
27  ice baths, and beat her with objects such as bolts, hangers, or boots, on a regular basis.
28  *Id.*

United States' Sentencing Position – Seth Randles – page 2

Even more shockingly, Victim M reported that when Defendant beat her to the point of needing medical care, she was not afforded the opportunity to receive it. *Id.* According to Victim M, her teeth almost went through her lip during one assault. *Id.*

When there was a dispute with a "client" about a commercial sex act, Defendant violently beat both the "john" and Victim M. *Id.* at ¶ 24. Why? Because he was worried that the "client" would post about the incident online and negatively affect his business. *Id.* If Victim M failed to charge double for a commercial sex act involving two women, Defendant violently beat her, dragging her by her hair and punching her in the gut. *Id.* at ¶ 25.

As Defendant admitted in his plea agreement, he also convinced Victim M to tattoo his street name "Silky" onto her leg. ECF No. 84 at ¶ 5; ECF No. 102 at ¶ 31. Pimps frequently cause their victims to tattoo the pimps' names onto the victims' bodies to create a permanent record that the victim belongs to that particular pimp. *See United States v. Purcell*, 967 F.3d 159, 168 (2d Cir. 2020) ("The women who worked for him were to call him 'Daddy,' and some of them received neck tattoos of the word 'Casino,' a reference to Purcell's 'pimp' alias, 'King Casino.'"); *United States v. Bell*, No. 1:12-CR-00027-JEG, 2013 WL 12086759, at *9 (S.D. Iowa June 19, 2013) (unpublished) (victim "described that when a prostitute has a tattoo of her pimp's name, '[s]he's branded' and others know that the prostitute belongs to the pimp"); *Shanklin v. Dexter*, No. CV 09-3557-SJO OP, 2010 WL 4137514, at *1 (C.D. Cal. July 20, 2010) (unpublished) ("Tattoos on [the victim's] arm and neck showed that she was [the pimp's] 'property,' and showed [his] street name and pimp name."). Obviously, Defendant's branding of another human being as his property was among the most degrading and dehumanizing conduct any person could engage in.

At the height of Defendant's pimping of her, Victim M was performing as many as ten sexual encounters per day. ECF No. 102 at ¶ 29. Only through the assistance of multiple agencies, family members, medical workers, a safe house, and a domestic violence protection order did Victim M free herself from Defendant's control. *Id.*

United States' Sentencing Position – Seth Randles – page 3

**B.    Victim S**

Due to extensive negotiations, the person identified in the PSIR as Victim S is not referenced by name or initials in Defendant's Plea Agreement.  As the Court can see, Defendant and Victim S have a child together who is now 9 years old.  ECF No. 102 at ¶¶ 205-206.  As is commonplace for victims of human trafficking – particularly those who share children with their pimps – Victim S has consistently declined to press charges, report any misconduct by Defendant, or work with law enforcement or victim outreach specialists.  *See* ECF No. 102 at ¶¶ 32-27.

Based on the information in the PSIR, the Court can nevertheless conclude by a preponderance of the evidence that Defendant trafficked Victim S for years.  *See United States v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (district courts use the preponderance of the evidence standard of proof for facts at sentencing, absent extremely disproportionate sentencing effect).  Given the severity of  Defendant's admitted conduct and sentencing exposure, the issue of whether he trafficked Victim S will not have an extremely disproportionate effect – she is one of at least six victims of his trafficking conduct.  The United States specifically preserved in the Plea Agreement the right to argue at sentencing that the Court should consider Defendant's conduct with regard to Victim S.  ECF No. 84 at ¶ 7.

Here, the preponderance standard is met.  The Court has statements from numerous eyewitnesses to Defendant's pimping and violent conduct toward Victim S, none of whom have any incentive to lie to law enforcement about what Defendant did to Victim S.  All of those statements – including statements from Victim M, an acquaintance of Victim S, and Victim S's *own mother* –  cross-corroborate one another.  Critically, independent evidence also corroborates Defendant's trafficking of Victim S.

First, Victim S's acquaintance was so concerned about injuries to Victim S in 2013 – while she lived in the same duplex where Defendant later pimped out Victim M – that she reported to FBI that Victim S had told her that Defendant beat her when she tried to stop sex trafficking for him.  ECF No. 102 at ¶ 33.

The FBI was able to confirm that Victim S was the same victim in a 2009 operation conducted by the Richland Police Department, in which an undercover officer went to a ruse "date" at which Victim S – who was 16 at the time – would watch while another victim engaged in sex for Defendant. *Id.* at ¶ 34. Victim S herself confirmed that Defendant was there "to keep both females safe." *Id*. The Court need only apply common sense to know that this was nothing more than a euphemism to cover for the fact that Victim S was already working for Defendant when she was only 16.

Perhaps unsurprisingly, in 2010, Spokane Valley Police responded to an incident in which Defendant was trying to push Victim S into a car, after which she had a black eye. ECF No. 102 at ¶¶ 36, 189. Again, Victim S covered for Defendant; she was taken into protective custody. *Id*.

Defendant's own cell phone belies his various self-serving and uncorroborated denials about his trafficking of Victim S. *See* ECF No. 104. In one of his devices were *47 images of Backpage.com depictions of Victim S.*, along with deleted references to "Unique Lust" and "Nicole Star," images depicting Victim S. interspersed with selfies of Defendant, indicia of postings on Backpage.com advertisements, and adult pornography. ECF No. 102 at ¶ 53.

Victim A also gave specific details about Defendant trafficking both her and Victim S., including when Victim S. was a minor. ECF No. 102 at ¶¶ 59a-i. Among other things, Victim A reported her firsthand, percipient knowledge that Defendant was pimping Victim S *because Defendant often made her and Victim S have sex with the same men at the same time. Id.* Of course, the Court need only compare the statements of Victim A in paragraph 59h with Defendant's admissions in paragraph 5 of his Plea Agreement to confirm that, in fact, Victim S was the other trafficking victim referenced in his Plea Agreement as "another adult woman."

Surely all of this evidence, taken together, is sufficient to establish by a preponderance that Victim S. was indeed one of Defendant's human trafficking victims. Defendant should not benefit from the fact that Victim S, like so many victims of

United States' Sentencing Position – Seth Randles – page 5

1   trafficking and domestic violence, has been unwilling to disclose to law enforcement the
2   harms she has suffered at Defendant's hands.  If it is not, the United States respectfully
3   submits that Defendant's overall conduct is still more than sufficient to justify a 20-year
4   sentence.

5       **C.    Victim A**

6        Defendant's admitted trafficking conduct with Victim A was just as egregious as
7   his conduct with his other victims, as the Court can see from her statements in the PSIR.
8   See ECF No. 102 at ¶¶ 59a-i.  He advertised her for sex, caused her to be trafficked at
9   least once a day and up to as many as ten times in a day, kept the money, kept her in line
10  with threats of violence, and made her engage in sex with men of his choosing in direct
11  violation of her wishes.  *Id.*  What Defendant forced Victims A and S to do in
12  Wenatchee as set forth in the PSIR was nothing more than forced serial rapes for his
13  profit.

14      **D.    Defendant's Other Conduct**

15       As the PSIR notes, Defendant's *known* human trafficking conduct likely involved
16  as many as six victims – but obviously, given his lack of provable gainful employment
17  (ECF No. 102 at ¶¶ 243-248), and admission that "roughly from 2009 onward, pimping
18  women to engage in commercial sex acts was his sole source of income" (ECF No. 84 at
19  ¶ 5), it seems unlikely that all of his trafficking conduct was captured in law enforcement
20  investigations.  He also unquestionably obstructed justice by instructing an associate to
21  delete the contents of his and his then-girlfriend's iCloud and device accounts.  ECF No.
22  102 at ¶ 62.  His uncharged conduct is absolutely corroborative of his charged conduct,
23  and equally disturbing.  ECF No. 102 at ¶¶ 93-106.

24       Even if the conduct set forth in the PSIR constituted Defendant's first brush with
25  the law, a 20-year sentence would be justified here based on the severity and violence of
26  his conduct.  But when the Court also considers Defendant's separate criminal history,
27  including a conviction for First Degree Burglary (with a deadly weapon), *see* ECF 123-
28  129, and his numerous expected violations of no-contact orders with his victims, it is

United States' Sentencing Position – Seth Randles – page 6

appropriate that Defendant's properly-calculated guidelines result in a range of 235-293 months.  Read in this context, the United States' recommendation of 240 months is actually significantly beneficial to Defendant.

In short, Defendant has demonstrated amply that he is a violent person.  His trafficking conduct in this case was not just legally inexcusable; it was a crime against basic human dignity and he should be punished accordingly.

## III.   The Presentence Report

For purposes of calculating the appropriate range under the United States Sentencing Guidelines (the "Guidelines"), the United States concurs with the Probation Office that Defendant's final adjusted offense level is Level 35.  ECF No. 102, ¶ 283. The Probation Officer concluded that Defendant has 7 criminal history points, placing him in Criminal History Category IV.  ECF No. 102, ¶ 162.  Defendant's properly-calculated Guidelines range is thus 235-293 months.  ECF No. 102, ¶ 221.

Pursuant to the limitations in the Plea Agreement, the United States recommends a sentence near the bottom of the properly-calculated Guidelines range: 240 months, to be followed by 15 years of Supervised Release.

## IV.   Defendant's Objections To The PSIR Should Not Be Sustained

Defendant has filed numerous objections to the PSIR.  ECF No. 104.  Many of these objections need not be resolved by the Court to come to a fair sentence.  Fed. R. Crim. P. 32(i)(3)(B).  Of course, the Court may consider any information at sentencing that is relevant to any of the factors set forth at 18 U.S.C. § 3553(a), including relevant conduct.  Many, if not all, of the statements to which the defense objects are statements from witnesses, which the Court may consider and weigh when determining sentence.

The United States requests that the Court formally determine that each objection (a) will not affect sentencing or the Court will not consider it at sentencing, or (b) conclude that the PSIR is correct and overrule Defendant's objections.  The United States submits the following responses to Defendant's objections.

| Obj. | PSIR ¶ | Recommendation | Argument |
|------|--------|----------------|----------|
| 1 | 12 | Overrule | Defendant led Victim M to believe that she was in a "normal" romantic relationship with him before trafficking her.  Defendant's behavior was standard practice for pimps.  It is called "Romeo" pimping, as opposed to "Gorilla/Guerilla" pimping, in which violence alone is used to coerce victims.  *See Pitcher v. Biter*, No. CV 18-6371-AG(E), 2019 WL 2807869, at *4 (C.D. Cal. Apr. 2, 2019) (unpublished) ("Commercial sex trafficking victims are most commonly recruited 'under the guise of romance.'  A 'Romeo pimp' is typically an older male who promises a romantic relationship or even marriage.  Such a strategy renders the victim much more likely to bond with the pimp. The pimp then transitions to a controlling and abusive relationship in which the focus is placed on the victim's need to 'contribute to [the] family.'  It is also common for victims to be used to recruit other victims. Pimps also frequently used competition or jealousy to manipulate and control their victims."); *Winn v. Sec'y of Corr.*, No. CV 17-9144-DOC (AFM), 2018 WL 4262458, at *6 (C.D. Cal. July 19, 2018) (unpublished) ("A 'Romeo' pimp is 'a smooth talking guy who uses mental manipulation to seduce his women into prostitution.' Romeo pimps befriend or become romantically involved with their targets, who 'start to develop a dependence on him . . . very similar to domestic violence syndrome.'  'Gorilla' pimps, in contrast, 'use sheer aggression and violence' to recruit prostitutes. They 'will just go and kidnap a girl and tell her you work for me now, you are my prostitute and force her to prostitute.'  Both types of pimps isolate their prostitutes by moving them away from their families and friends.  'They may take their identification, take their cell phone, or any other personal items that they have and they will restrict them from having contact with their family. They'll |

| | | | |
|---|---|---|---|
| | | | move them around from motel to motel, and city to city, or state to state, keeping them isolated so the girl has to rely on the pimp and all her reliance is based off of him.'"); *Oliver v. Ducart*, No. 15-CV-00397-JD, 2016 WL 627363, at *4 (N.D. Cal. Feb. 17, 2016) (unpublished) ("A 'guerilla pimp' drives around and 'snatch[es]' a girl off the street and 'uses fear of force to get a girl to work for [him].' Often a guerilla pimp will take the girl to a 'break house' to 'break her down, have his friends have sex with her until she agrees to work for him.' The second type is the 'Romeo pimp,' who manipulates the girl with attention and love. He tries to make his girls feel they are a part of his family and will sometimes give the girls marijuana and alcohol to make it easier for the girls to work. Often, pimps will have a new girl work with other girls to create a 'family type of atmosphere.' Both tactics of the guerilla pimp and the Romeo pimp are used to control the girls.") |
| 2 | 12 | Overrule | The Court should consider Victim M's statements in the PSIR, just as the Court should consider Defendant's statements in the PSIR. There is no dispute that these statements came from Victim M; the Court has discretion to weigh them in arriving at a just sentence. |
| 3 | 13 | Overrule | The Court can consider Victim M's mother's statements just as the Court should consider Defendant's statements in the PSIR. There is no dispute that these statements came from Victim M's mother; the Court has discretion to weigh the statements in arriving at a just sentence. |
| 4 | 15 | Overrule | The Court should consider Victim M's statements in the PSIR, just as the Court should consider Defendant's statements in the PSIR. There is no dispute that these statements came from Victim M; the Court has discretion to weigh them in arriving at a just sentence. |

| 5 | 17 | Overrule | The Court can fairly conclude by a preponderance based on the information in the PSIR that Defendant's conduct indicated an effort to evade law enforcement by using a decoy location for his criminal conduct. |
|---|---|---|---|
| 6-9 | 32-37 | Overrule | As set forth above, there is significant, corroborated evidence that establishes by a preponderance of the evidence that Defendant engaged in sex trafficking of Victim S. |
| 10 | 43 | Ruling unnecessary because matter will not affect sentencing.  Fed. R. Crim. P. 32(i)(3)(B). | The Court need not determine whether Defendant was trafficking N.P. on Backpage or she was prostituting herself on Backpage to come to a just sentence in this case, based on his trafficking of numerous other victims. |
| 11 | 55 | Overrule | N.P. need not have been a co-conspirator or trafficking victim for Defendant's instructions to a friend to delete both her information and his information from the iCloud and their devices to constitute obstruction.  It is difficult to imagine a clearer example of obstruction of justice than a person incarcerated for online sex trafficking, who had posted online trafficking advertisements and used text messages to enforce his will, to ask someone to delete that information before law enforcement could get it.  This one is not a close call.  Because the friend was successful in deleting the information, it is impossible to know what the friend deleted from the iCloud or the devices of N.P. or Defendant.  That is the whole point of obstruction—to make it impossible to prove up the evidence.  U.S.S.G. § 3C1.1, App. Note 4D (it is obstruction to instruct someone else to destroy material evidence); App. Note 6 ("material" includes information that, if believed, would tend to influence the issue under determination).  Obviously, text messages and Backpage posts on Defendant's or N.P.'s devices or iCloud that would |

| | | | |
|---|---|---|---|
| | | | demonstrate that he was trafficking her, would affect sentencing here as relevant conduct. |
| 12 | 56 | Ruling unnecessary because matter will not affect sentencing. Fed. R. Crim. P. 32(i)(3)(B). | Whether Defendant used a particular Yahoo account is not relevant; the Court can consider Victim M's statements just as it considers Defendant's statements. |
| 13-14 | 58-59 | Ruling unnecessary because matter will not affect sentencing. Fed. R. Crim. P. 32(i)(3)(B). | The Court can consider Victim M's statements just as it considers Defendant's statements. |
| 15 | 62 | Overrule (as with Obj. 11 above) | See above. |
| 16 | 65 | Overrule | Obstruction and instructing people to destroy evidence *is* inconsistent with acceptance of responsibility. Nevertheless, these evaluations are often nuanced, and it is fair under these circumstances that Defendant gets both a 2-level enhancement for obstruction and a 3-level departure for acceptance of responsibility before the United States had to prepare witnesses for trial. He did both of those things. |
| 17-18 | 77, 83 | Overrule | It has been demonstrated by a preponderance of evidence that Defendant trafficked Victim S, as set forth throughout the PSIR and this sentencing position. That sex trafficking conduct is clearly relevant to Defendant's charged sex trafficking. Without the victim acknowledging that Defendant trafficked her when she was a minor, the United States was willing to remove her name from Defendant's plea agreement because it was important to him not to have her named in a factual |

United States' Sentencing Position – Seth Randles – page 11

| | | | basis to which he agreed. But the Court does not need Defendant's agreement to conclude that Defendant's sex trafficking of Victim S – often at the exact same time and in the same exact location as with other victims, on "duo dates" – constitutes relevant conduct under the Guidelines. Defendant's recommended offense level of 27 for Defendant's overall conduct – including all relevant sex trafficking conduct in a sex trafficking case – is both inaccurate and inappropriate. |
|---|---|---|---|
| 21 | 97 | Ruling unnecessary because matter will not affect sentencing. Fed. R. Crim. P. 32(i)(3)(B). | The number of years of Defendant's trafficking conduct and whether his motorcycle friends knew about it is not relevant to sentencing. |
| 19, 20, 21 | 101, 102, 106 | Overrule *following misnumbering in defense objections | The Court may consider information from S.J. in determining whether there is a preponderance of evidence that Defendant trafficked Victim S – just like the Court may consider statements from Defendant that he did not. The Court has the discretion to accept these statements and give them whatever weight the Court concludes is appropriate. |
| 22 | 126-129 | Overrule | It is inappropriate to allege bias on the part of the Probation Officer. The Court may consider this recounting of the facts of that case in determining Defendant's personal history and characteristics. |
| 23 | 132-137; 144-150; 160-162 | Overrule | The PSIR's calculations are correct and Defendant's criminal history is not overstated. |
| 24-25 | 195, 196 | Ruling unnecessary because matter | This information is not relevant to the imposition of sentence in this case. |

| | | | | |
|---|---|---|---|---|
| | | will not affect sentencing. Fed. R. Crim. P. 32(i)(3)(B). | | |
| 26 | 209 | Overrule | | These statements came from Defendant himself. It is difficult to discern a valid basis for excluding his own positive descriptions of his own childhood, unless the Court is prepared to exclude *all* of his statements in the PSIR, which would be equally inappropriate. To whatever extent defense counsel seeks to discredit Defendant's description of his own life, that can be accomplished during argument at his sentencing hearing. |
| 27 | 225-232 | Overrule | | It is inappropriate to allege bias against the Probation Officer based on these statements. As above, these statements *came from Defendant himself*, even if they are not consistent with arguments that defense counsel wishes to make on his behalf. The Court should consider them. |
| 28 | 248 | Overrule | | The PSIR states that there are no records of his employment at those locations at those times. That appears to be accurate. |
| 29-31 | 256, 266, 278 | Overrule | | See above. The PSIR's Guidelines calculations are correct, and Defendant's fine and criminal history calculations are based on the correctly-calculated Guidelines offense level. |
| 32 | 282 | Overrule | | The Court may wish to consider mitigation arguments, but there is no Guidelines calculation error to correct here. |

United States' Sentencing Position – Seth Randles – page 13

## V.    The United States' Sentencing Recommendation

The United States is mindful that the United States Sentencing Guidelines ("the Guidelines" or "U.S.S.G.") are "the starting point and the initial benchmark" for sentencing, *United States v. Carty*, 520 F.3 984, 991-92 (9th Cir. 2008), and the United States is obliged to seek a sentence that will be sufficient but not greater than necessary to avoid sentencing disparity, punish, protect the community, and deter.

Thus, it is important that the Court resolve all necessary objections and correctly calculate the Guidelines. But given the egregiousness, violence, and ongoing nature of Defendant's sex trafficking conduct, the United States respectfully submits that 240 months is the correct sentence for Defendant under all the factors set forth at 18 U.S.C. § 3553(a).

In a post-*Booker* landscape, the Court has the discretion to impose any legal sentence, after correctly calculating and considering the Guidelines. In many cases, this principle inures to the benefit of Defendants, and courts routinely depart from the correctly-determined ranges to reach fair and just sentences *beneath* the Guidelines.

Here, the United States respectfully submits that the PSIR is correct and Defendant's Guidelines range is 235-293 months, based on a final adjusted offense level of 35 and Criminal History Category IV with 7 criminal history points. The United States' recommendation of 240 months is at almost the bottom of this properly-calculated Guidelines range.

But if the Court concludes that any of Defendant's objections are well-taken, the United States asks the Court to apply the principles set forth in *Booker*, and depart as necessary to reach a fair and just sentence for this violent sex trafficker: 240 months in custody, followed by 15 years of Supervised Release.

The United States submits that such a sentence is sufficient, but not greater than necessary, to achieve the sentencing goals set forth at 18 U.S.C. § 3553.

A.    **The Nature and Seriousness of the Offense and Defendant's Respect for the Law**

Human trafficking is modern day slavery.  As President Obama described it in 2012, a short time before Defendant's admitted conduct in this case:

> It ought to concern every person, because it's a debasement of our common humanity.  It ought to concern every community, because it tears at the social fabric.  It ought to be concern every business, because it distorts markets.  It ought to concern every nation, because it endangers public health and fuels violence and organized crime.  I'm talking about the injustice, the outrage, of human trafficking, which must be called by its true name – modern slavery.

President Barack Obama, addressing the Clinton Global Initiative, September 9, 2012, available at https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative, last accessed on September 16, 2021; *see also* Attorney General Eric Holder, Announcing the Human Trafficking Enhanced Enforcement Initiative, February 1, 2011, available at https://www.justice.gov/opa/pr/department-justice-announces-launch-human-trafficking-enhanced-enforcement-initiative, last accessed on September 16, 2021 ("This modern-day slavery is an affront to human dignity, and each and every case we prosecute should send a powerful signal that human trafficking will not be tolerated in the United States.").

It is for this exact conduct – this injustice, this outrage, this affront to human dignity – for which Defendant must now be sentenced.  He turned human beings into property.  He commodified his victims' most intimate sexuality.  He violently beat them to ensure that he could keep making money and avoid law enforcement while doing so.  If ever there were a Defendant to stand before this Court at sentencing who deserves a 20-year custodial sentence, it is Seth Randles.

The highly-detailed PSIR paints an accurate picture of Defendant as a pimp.  From 2009 onward, the only way he made money was by trafficking young women.  He advertised their services in no uncertain terms, and then he made them engage in sexual acts whether they wanted to or not, with whomever he chose, with him right upstairs.  He beat them violently if they objected or challenged him.

He even drove them all over the state to engage in this conduct, facilitating serial gang rapes of at least two victims. ECF No. 102 at ¶ 59h. One victim recalled that "it was odd that numerous migrant Mexican workers were at the hotel awaiting their arrival" in Wenatchee. *Id.* During this encounter, the "clients," who were lined up outside the door for sexual acts, paid Defendant directly. *Id.* According to Victim A, Victim S was severely injured, when, after performing ten or more sexual acts, she told Defendant that her body was worn out and they got into an argument. *Id.* When Victim A returned to the room, Victim S was on the floor and Defendant was standing over her, holding a bloodied white towel, frantic, claiming "it was an accident." *Id.* But instead of seeking medical care for Victim S, Defendant made Victim A go to a drugstore to purchase a cleaning solution and super glue. *Id.* Once Victim S had her wound glued shut, Defendant forced her to continue engaging in commercial sex acts. *Id.* As the Court knows from the PSIR, this was just one of the many, many times Defendant trafficked one of his victims for his own financial gain without any regard for them.

Defendant's practice was as sophisticated as it was prolific. In addition to advertising for his victims on Backpage and Adult Hobby Board, he created and kept a "contact list," writing down "client" contact numbers when a phone was going to be discontinued from use. ECF No. 102 at ¶ 45. Victim M reported that Defendant used specific terms to identify aspects of his "business": the term "con" listed next to telephone numbers on the list indicated that the "client" was "confirmed," meaning that Defendant had successfully trafficked a victim to that "client" and been paid. *Id.* The term "No Go" meant a previous date was bad or a potential law enforcement contact. *Id.*

Defendant's sentence must be significant. His offense was serious and violent, went on for years, and victimized numerous young women. He has demonstrated an ongoing disregard for the law, including telling an officer en route to jail for one of his many prior offenses, that he had "spent 4 years in prison studying how to beat charges." ECF No. 102 at ¶ 180. His lack of respect for the law is also shown by his direction – while in jail – to a friend to destroy evidence in this case.

### B.    Defendant's Personal History and Characteristics

Defendant's personal history and characteristics simply do not absolve him of responsibility for his violent trafficking conduct and obstruction of justice. Defendant's life has had challenges, to be sure. But the United States' willingness to resolve this case with a 20-year cap on its recommendation takes into account the offsetting factors set forth in the PSIR.

This is a case in which the severity and egregiousness of a Defendant's criminal conduct simply outweighs anything about his personal history or characteristics that would be mitigating. The Federal Defenders, as usual, have done an exemplary job of trying to locate whatever they can to mitigate Defendant's conduct. But with Seth Randles, that task has proven too much to bear. There is simply nothing in the PSIR that meaningfully mitigates or justifies the horrendousness of Defendant's conduct. If anything, the abuse alleged to be in Defendant's past should have taught him how destructive abuse and violence are to a human being's psyche. Needless to say, no human being should really need to be taught or have good role models to know that one human being cannot enslave another for his own sexual and financial gratification.

The United States anticipates a defense sentencing position that will focus on Defendant's personal characteristics, while largely ignoring the need for punishment and accountability, and the risk Defendant undoubtedly poses to additional victims in the community once he is released. By Defendant's own admission, he has had no other source of income besides trafficking since 2009; given that trafficking appears to be all he knows how to do well, the Court might well wonder what exactly he is going to do when he gets out. The United States urges the Court to impose a sentence that takes into account *all* of Defendant's personal history and characteristics – not just those articulated by his defense team. As his victims have articulated, his personal history and characteristics include violence, manipulation, criminality, and abuse of others. Those things matter too, and the Court should consider them in coming to a just result in this case—not just for Defendant, but for his victims and this community.

## C.    Just Punishment

Whatever success the defense may have in trying to get the Court to reduce Defendant's Guidelines calculation, the United States urges the Court to bear in mind the statutory requirement that it impose a sentence that punishes justly.  There are real live victims in this case, and they can never be made whole by Defendant or this Court.  But if the Court imposes a sentence lower than the 20 years contemplated in the Plea Agreement, what is the message for his victims and their experience with the federal criminal justice system?  Justice for them demands accountability for Defendant.

The only mechanism for creating accountability in this process is the sentence imposed by this Court.  When someone violates the law so often and so egregiously – to say nothing of violating the basic moral and ethical codes applicable to being a human being – that person must be punished significantly.  Taking into account Defendant's trafficking conduct, his violence, his criminal history, his obstruction of justice, and the number of his victims, it is clear that a severe punishment is appropriate.  20 years is sufficient, but not greater than necessary, to effectuate the goals of sentencing.

## D.    Deterrence

Traffickers know what other traffickers get in court.  A 20-year sentence is necessary in this case to deter Defendant and others from engaging in this form of modern day slavery.  It seems almost too obvious a point to belabor, but pimps have to know that if they get caught, they will go to federal prison for a long time.  It is the only way to disincentivize this kind of conduct, especially where not all victims – as here – are ready to come forward on their own behalves.

Defendant has demonstrated, through his repetitive and ongoing conduct, that specific deterrence is also necessary here.  This Court's sentence must be long enough to make Defendant take it seriously.  To deter him, the sentence imposed must be distasteful enough that when he gets out, he chooses not to engage in it anymore.  To the extent that human beings are incentive and disincentive-driven creatures, it is essential that Defendant and others like him know that the penalties for this conduct are severe.

### E.    Protection of the Public

Women and girls in the Eastern District deserve to live in a world in which they have control of their own sexual sanctity – a world in which *they* get to choose whom to engage with sexually and a world in which they are not beaten if they ignore the orders of someone like Defendant.  Defendant has amply demonstrated that he presents a danger to this community from Richland to Wenatchee to Spokane, and there is little question that he would still be endangering new victims if Victim M had not bravely come forward in 2017.

The question for this Court is stark: what sentence is necessary to protect girls and women from Defendant?  The community depends on the Court to be its voice, and the community deserves a clear statement that sex trafficking and modern-day slavery cannot – and will not – be tolerated in a just society.

The need to protect the public also justifies 15 years of supervised release.  For someone with Defendant's years of trafficking conduct and no other real saleable skills, the watchful eye of United States probation will be necessary to ensure that he has truly reintegrated into society.

### F.    Avoidance of Unwarranted Sentencing Disparities

The best way to ensure consistent sentences for similarly-situated defendants across the country is for courts to apply the sentencing Guidelines in the same manner everywhere.  *United States v. Guerrero-Velasquez*, 434 F.3d 1193, 1195 n.1 (9th Cir. 2006) (recognizing that the Guidelines "help to maintain uniformity in sentencing throughout the country"); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly.").  Here, the United States' recommendation is roughly commensurate with the low-end of the properly-calculated Guidelines in the PSIR.  It takes into account Defendant's years of sex trafficking conduct, his past criminal history and violence, his demonstrated lack of respect for the law and judicial process, and his personal history and characteristics.

1  A lower sentence carries a significant risk of creating an unwarranted sentencing
2  disparity with similarly-situated Defendants across the country.  240 months is by no
3  means a short sentence, but is significantly below the sentences imposed for sex
4  trafficking in many federal cases.  *See, e.g.*, *United States v. Todd*, 627 F.3d 329, 332
5  (9th Cir. 2010) (affirming sentence of 312 months); *U.S. v. Carreto*, 583 F.3d 152 (2d
6  Cir. 2009) (affirming sentences of 50 and 25 years); *U.S. v. Cortes-Meza*, 685 Fed. Appx
7  731 (11th Cir. 2017) (affirming sentence of 480 months) *U.S. v. Fields*, 625 Fed. Appx
8  949 (11th Cir. 2015) (affirming a sentence of 480 months); *U.S. v. Mendez*, 362 Fed.
9  Appx 484 (6th Cir. 2010) (affirming sentence of 600 months); *United States v. Brown*,
10  802 Fed. Appx 243, 246 (9th Cir. 2020) (affirming sentence of 360 months).

### G.  Fine, Special Penalty Assessment, Restitution, and Forfeiture

12  The United States is free to make any recommendation concerning a criminal fine.
13  The Probation Officer has analyzed Defendant's financial condition and has concluded
14  that he does not have the resources available to reasonably pay a fine.  ECF No. 102,
15  ¶ 254.  Accordingly, the United States does not seek a fine.  A $200 special assessment
16  is mandatory.  The United States defers to the Court regarding Defendant's indigence
17  and the applicability of the $5,000 Special Assessment pursuant to the Justice for
18  Victims of Trafficking Act of 2015.  The United States has not yet received any
19  restitution requests from victims, but will update the Court and counsel if any are made.

### VI.  Conclusion

21  The United States recommends that the Court rejects Defendant's Guidelines
22  objections, calculates her sentencing range at 235-293 months, and imposes a sentence
23  of 240 months (20 years) in custody, to be followed by 15 years of supervised release.

Dated: September 16, 2021

Joseph H. Harrington
Acting United States Attorney

*s/ David M. Herzog*
David M. Herzog
Assistant United States Attorney

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on September 16, 2021, I electronically filed the foregoing

3 with the Clerk of the Court using the CM/ECF System, which will send notification of

4 such filing to Defendant's counsel of record using the CM/ECF system.

5

6                                    *s/ David M. Herzog*

7                                    David M. Herzog
                                     Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28